[Cite as *State v. Crisp*, 2023-Ohio-3537.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

State of Ohio

      Appellee

v.

Elmeco R. Crisp

      Appellant

Court of Appeals Nos.  WM-22-005
                         WM-22-006

Trial Court Nos.  21CR000244
                  22CR000059

**DECISION AND JUDGMENT**

Decided:  September 29, 2023

\* \* \* \* \*

Katherine J. Zartman, Williams County Prosecuting Attorney,
for appellee.

Karin L. Coble, for appellant.

\* \* \* \* \*

**ZMUDA, J.**

{¶ 1} In this consolidated appeal, following a bench trial, defendant-appellant, Elmeco R. Crisp, appeals the November 9, 2022 judgments of the Williams County Court of Common Pleas, convicting him of domestic violence and failure to appear, and sentencing him to prison terms of 17 months and 12 months, to be served consecutively. For the reasons that follow, we affirm the trial court judgments.

## I.     Background

{¶ 2} Elmeco R. Crisp was indicted in Williams County case No. 21CR000244 on one count of domestic violence, a violation of R.C. 2919.25(A) and (D)(3), a fourth-degree felony. He was indicted in Williams County case No. 22CR000059 on one count of failure to appear, a violation of R.C. 2937.99(A) and (B), also a fourth-degree felony. The cases were consolidated for a bench trial, which took place on September 13, 2022. The victim, K.B., testified for the state, as did Bryan Police Officers Justin Garza, Derek Beardsley, and Ross Butler. Crisp testified in his own defense.

### A. The State's Case-In-Chief

{¶ 3} According to the state's evidence, 14-year-old, K.B., lived with her mother, J.H., and her mother's boyfriend, Crisp, in a one-room home in Bryan. On December 16, 2021, K.B., J.H., and Crisp got up early and went out to eat. They later walked around, then went to a bar, where J.H. and Crisp had alcoholic drinks. J.H. and Crisp began arguing, and they eventually went home.

{¶ 4} At some point, when it was dark out, J.H. and Crisp got bottles of an alcoholic beverage. Crisp was in the kitchen dancing, celebrating "because it was [the] last day of child services." Later, J.H. and Crisp did the dishes and were standing by the sink whispering while K.B. lay down in J.H's bed. J.H. "started freaking out and getting mad" and Crisp went into the bathroom.

2.

{¶ 5} K.B. and J.H. lay in bed together, and Crisp came in the room and pulled the blanket off of J.H. J.H. pulled it back up. Crisp pulled it off again, hit J.H. in the face, spit on her, and poured alcohol on her. K.B. was upset that Crisp did this to her mother for no reason. Soon after, Crisp left. K.B. and J.H. also left and went to K.B.'s uncle's house, but he did not answer the door. They stayed in his backyard for a while, then returned home. K.B. said she was going to "Anthony's house." Her mother told her to be home by 9:00 p.m.

{¶ 6} Anthony walked K.B. home around 9:12 p.m. The doors were locked. K.B. knocked, and her mother answered the door. K.B. and J.H. again lay down in J.H.'s bed. At around 2:00 a.m. they awoke to Crisp banging on the windows, asking to be let in. K.B. told her mother not to let Crisp in, but she did anyway. He came in the house "screaming and yelling." He turned on all the lights and started making macaroni and cheese. Afterwards, he told J.H. he wanted to lie down, so J.H. asked K.B. to leave her bed.

{¶ 7} J.H. and Crisp again began yelling at one another. J.H. stood up and pushed down K.B.'s dresser, which separated the two beds in the home, and K.B.'s belongings fell out of the dresser. K.B. yelled at her mom for this, but J.H. was not listening because she was yelling at Crisp to leave. At first Crisp refused to leave, but then "he went into the closet door" "to get all of his stuff," which included "his clothes." In the past when he would leave, Crisp would put his clothes in bags.

3.

**{¶ 8}** J.H. was crying and K.B. told Crisp he wasn't going to leave "cause he didn't have anywhere to go." Crisp told J.H. and K.B. that he was going to set the house on fire. He took a rug and put it on the stove, and it started smoking. J.H. told K.B. that they had to get out of the house, but Crisp took the rug off the stove.

**{¶ 9}** K.B. yelled at Crisp and threw two candles, a container, and a book at him. Crisp warned J.H. "if she throws something at me again…," at which point K.B. threw a bottle of hand sanitizer at him. Crisp "came at" K.B. and she fell down. He hit her in the eye. K.B. recalled that it hurt—she saw "black and white," was "sitting on the floor crying," and was "really upset." J.H. yelled at Crisp and Crisp just walked around. K.B. told her mother she was leaving and going to the police station. Crisp called his mother and told her "if I go to jail * * * I'm going to make sure you're taken care of right."

**{¶ 10}** K.B. walked to the police station, about four-and-a-half blocks away, and asked to speak to someone. Officer Butler asked K.B. to write a statement and he took photographs of her face. He described that K.B. appeared "kind of like scared, shy, timid." He observed redness in her eye and on her upper cheek, underneath her left eye. After the photographs and statement were completed, he and a sergeant went to the residence to try to make contact with anyone inside. They knocked and announced themselves several times. The lights appeared to be off and the windows were covered; it seemed there was nobody home.

4.

{¶ 11} Officer Butler went back to the station and tried to contact J.H. at her place of employment, but she had called off around 3:00 a.m. Her employer provided contact information for J.H. and he tried to call her, but she did not answer. He left a voicemail, but she did not return the call. Officer Butler then contacted Job and Family Services for assistance. K.B.'s foster parents picked her up from the station.

{¶ 12} Officer Butler ran a check of Crisp and J.H. in LEADS. The LEADS search turned up a Lima address for Crisp, which is tied to his driver's license, and a Bryan address for J.H. Officer Butler discovered that Crisp had a prior domestic violence conviction in Lima. Based on that information, he filed a warrant for felony domestic violence.

{¶ 13} Officers Justin Garza and Derek Beardsley went to the home to serve the warrant on Crisp. J.H.'s father was on the scene, as was her sister. The officers knocked, but no one answered. The officers had information that Crisp and J.H. were in the home and that J.H. may be held captive or hurt. Because of the fear for J.H.'s safety, Officer Garza contacted the police chief and made arrangements with the landlord to get a key. The chief and Officer Beardsley knocked, then eventually entered the residence where they made contact with Crisp. J.H. was also there. Crisp had been in the bathroom. He came out and got his clothes. The officers arrested Crisp, and Garza took Crisp into custody. Officer Beardsley stayed to take pictures. The stove showed evidence of the rug having been burned; the burnt rug was retrieved from the trash can.

5.

{¶ 14} At the station, after being advised of his *Miranda* rights, Crisp told Officer Garza that the juvenile female had thrown objects at him, but he denied striking her. He said the juvenile left the residence and J.H. went looking for her, but they did not call the police.

### B. Crisp's Crim.R. 29 Motion for Acquittal

{¶ 15} After presenting this evidence, the state rested. Crisp moved for acquittal under Crim.R. 29 on the basis that the state failed to show that the incident involved a "family or household member," therefore, it failed to present sufficient evidence of domestic violence. The state responded, and cited the Ohio Supreme Court's decision in *State v. Williams*, 79 Ohio St.3d 459, 683 N.E.2d 1126 (1997), in support of its position that the evidence was sufficient to establish that J.H. and Crisp were cohabitating, therefore, K.B. was "a family member or household member" for purposes of the domestic violence statute. It explained that *Williams* defines cohabitation to include the sharing of familial or financial responsibilities and consortium.

{¶ 16} The state emphasized that as to the sharing of familial or financial responsibilities, it had presented evidence from K.B. that Crisp and her mother shared shelter, food, and clothing. As to consortium, the state highlighted evidence demonstrating that Crisp and J.H. were affectionate, they kissed, held hands, and Crisp would comfort her when she had anxiety.

6.

{¶ 17} Pertinent to the issue of cohabitation, K.B. testified that Crisp would stay with her and J.H. "for a long time," "he'd leave for like a week" to go to Lima if "he had appointments and stuff," then he would come back. She estimated that Crisp would stay with her and J.H. for about "a month." K.B. described that Crisp went for treatment in Lima for a fractured foot he got from "running around" with K.B. and for injuries sustained in a car accident. She recalled that once or twice, Crisp had received mail at their house. She did not know if he was on the lease or whether he had a key to the house; she thought he might have taken her mother's key. K.B. did not believe that Crisp paid any bills at the house. He did not have a job, so her mother would help him out. Crisp often talked with his mother on the phone, but K.B. did not know where his mother lives.

{¶ 18} K.B. also testified that the three of them would go out to eat together or he and J.H. would cook together. They would watch movies together. Crisp would sleep in her mother's bed. Crisp and J.H. were affectionate together—they would hold hands, kiss, and cuddle. If her mom was sad, he would comfort her and rub her back. Sometimes K.B. and Crisp would argue when she told him to get out of her room, or if Crisp was arguing with K.B.'s mother, K.B. would jump in to defend her.

{¶ 19} The officers also testified to facts pertinent to cohabitation. Officer Beardsley said that Crisp's clothes were in various areas throughout the residence. Officer Garza couldn't remember where Crisp's clothes were located.

7.

{¶ 20} The court denied Crisp's motion.

**C. Crisp's Case-In-Chief**

{¶ 21} Crisp testified in his own defense. On the issue of his residence, he said he has lived with his mother on Calumet Avenue in Lima, Ohio, since 2001. He maintained that he has a bedroom there, all his things are there, and his mail goes there. The Lima address is on his driver's license, he uses that address for social security and other business purposes, and that is the address used for his probation in Lima. He acknowledged that he spent time at J.H.'s residence, but he claimed only that he "would go and visit her every now and then" and would stay one or two nights at the most. He denied staying there months at a time and denied that he had furniture there. He said he kept an outfit or two there. Crisp acknowledged that he was at the residence on December 16, 2021, but claimed that he had only spent a day or two there. He was not on the lease, had no key, and no utilities were in his name.

{¶ 22} Crisp testified that there was a pending children's services case involving J.H. and K.B., but claimed that he was not an active participant. He said that Job and Family Services closed a case against him because it concluded that he was not living in the home.

{¶ 23} As to the incident itself, Crisp said that he did not remember much about the day because he had had hernia surgery in November and was still on medication. He described that his relationship with K.B. was "alright," but she was mouthy and always

8.

wanted to intervene between him and J.H. He agreed that they had gone out to eat that day and that he and J.H. had arguments, but he denied that there was anything physical. He recalled that he left J.H.'s home the night of the incident, then came back around 1:00 a.m. and had to knock on the window to ask to come back in. He claimed that he "put the rug on the stove just to calm everybody down" because they were arguing.

{¶ 24} When Crisp got back to the house around 1:00, he fixed himself something to eat because J.H did not want to make food for him. He went to lie down with J.H., and J.H. asked K.B. to get up and go to her own bed. This caused K.B. to "throw a little fit cause she had to get up and get in her own bed so" Crisp could lie down. At that point, "stuff started getting thrown." Crisp told J.H. to tell K.B. to stop throwing things, but K.B. hit him with a candle and a book. He told K.B. to chill out, then she came at him swinging. He put his hand up trying to fend her off. She fell to the ground, but Crisp denied striking her. He did not know why she fell to the ground. He did not see any red mark. He claimed that he did not know that K.B. was going to the police station.

{¶ 25} On the issue of his failure to appear in court, Crisp conceded that he missed a court date, but claimed that he was sick and had tried to call his attorney's office to get his April 12, 2022 court date changed. He insisted that he was in Lima with a stomach ache, throwing up. He has no documentation that he was sick that day and did not go to the hospital or the doctor. He called the court, but was advised to talk to his attorney. He has a physician in Lima, but does not have one in Williams County. The court took

9.

judicial notice that defense counsel was present in court on April 12, 2022, and counsel made an oral representation that he had received a call that Crisp could not be there because he was sick. Bond was revoked and a bench warrant was issued for his arrest.

{¶ 26} On cross-examination, Crisp acknowledged that he had a prior domestic violence conviction out of Lima Municipal Court. He admitted that he has a sexual relationship with J.H. and would occasionally stay at her residence. He claimed he would bring only an outfit or two to her place. Crisp admitted that he was not supposed to be at J.H.'s house, but insisted that J.H. asked him to come over. He acknowledged that he drank alcohol on December 16, 2021—he claims he had "a drink." He denied that he drank to excess. He admitted that he had a beer after he left J.H.'s place in the early morning hours of December 17, 2021.

### D. The Trial Court's Verdict

{¶ 27} On September 29, 2022, the trial court orally announced its verdict in open court. The court found Crisp guilty on both counts. It continued the matter for sentencing. On October 27, 2022, the court imposed a prison term of 17 months on the domestic violence conviction, 12 months in prison on the conviction for failure to appeal, and up to two years' discretionary postrelease control on both counts. The court ordered that the prison sentences be served consecutively. The trial court's sentencing entries were filed on November 9, 2022.

10.

**E. Crisp's Assignments of Error**

{¶ 28} Crisp appealed.  He assigns the following errors for our review:

Assignment of Error One:  Mr. Crisp's conviction for domestic violence violates Due Process as it is based on insufficient evidence.

Assignment of Error Two:  The trial court's findings were insufficient to warrant imposition of consecutive sentences.

**II.      Law and Analysis**

{¶ 29} In his first assignment of error, Crisp argues that his domestic-violence conviction lacked sufficient evidence that he was a "family or household member."  In his second assignment of error, he challenges the trial court's imposition of consecutive sentences.  We consider each of these assignments in turn.

**A. Sufficiency of the Evidence**

{¶ 30} Crisp was convicted of domestic violence, a violation of R.C. 2919.25(A).  R.C. 2919.25(A) prohibits a person from "knowingly caus[ing] or attempt[ing] to cause physical harm to a family or household member."  In his first assignment of error, Crisp argues that his conviction is not supported by sufficient evidence because the state failed to show that he was a "family or household member" for purposes of R.C. 2919.25(A).

{¶ 31} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing

11.

the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.)  *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).  In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses.  *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).  "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law."  *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13.  Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence."  *Id.*

{¶ 32} R.C. 2919.25(F)(1)(a)(iii) defines "family or household member" to include "a child of a * * * person living as a spouse * * * of the offender."  A "person living as a spouse" means "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question."  R.C. 2919.25(F)(2).  Ohio courts recognize that "[t]he burden of establishing cohabitation is not substantial."  *State v. Woullard,* 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 73 (2d Dist.).  *See also State v. McManaway,* 9th Dist. Wayne No. 20AP0046, 2022-Ohio-2086, ¶ 13.

{¶ 33} There are two seminal Ohio Supreme Court cases explaining what it means to "cohabitate" for purposes of the domestic violence statute:  *Williams*, 79 Ohio St.3d

12.

459, 683 N.E.2d 1126, and *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4

N.E.3d 1021.  In *Williams,* the Ohio Supreme Court identified the essential elements of

"cohabitation" to include "(1) sharing of familial or financial responsibilities and (2)

consortium."  *Id.* at paragraph two of the syllabus.  The victim in *Williams* testified that

she did not live with the defendant, but they "were going together," and for a few months,

she was staying more nights at his place than at hers.  *Id.* at 460.

{¶ 34} The court recognized that "[i]n contrast to 'stranger' violence, domestic

violence arises out of the *relationship* between the perpetrator and the victim."

(Emphasis in original.)  *Id.* at 462.  It cited studies showing that "the rate of violence in

dating relationships is at least the same as, if not greater than, that of couples who

maintain one address."  *Id.,* citing Klein & Orloff, Providing Legal Protection for

Battered Women: An Analysis of State Statutes and Case Law, 21 Hofstra L.Rev. 801,

836-837 (1993).  The court observed that the General Assembly recognized the special

nature of domestic violence when it drafted the domestic violence statutes, and

emphasized that "the offense of domestic violence arises out of the relationship itself, not

the fact that the parties happen to share one address."  *Id.* at 463.

{¶ 35} To that end, the Ohio Supreme Court set out to define what it means to

"cohabitate."  It concluded that "the essential elements of 'cohabitation' are (1) sharing of

familial or financial responsibilities and (2) consortium."  *Id.* at paragraph two of the

syllabus.  It provided examples of possible factors that may establish "shared familial or

13.

financial responsibilities," including "provisions for shelter, food, clothing, utilities, and/or commingled assets." *Id.* at 465. It also provided examples of possible factors that may establish "consortium," including "mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations." *Id.* The court explained that "[t]hese factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact." *Id.*

{¶ 36} Under the facts of the case in *Williams*, the Ohio Supreme Court observed that the victim and the defendant had been fighting over money, suggesting that there was a commingling of assets, and, therefore, a sharing of familial or financial responsibilities. Moreover, the victim had testified that she and the defendant spent most of their nights together at his residence and, at one time, she thought she might be pregnant with his child, "demonstrating society and conjugal relations," and by extension, consortium. *Id.* On these facts, the court found that there was sufficient evidence upon which it could be concluded that the victim and the defendant were "family or household members."

{¶ 37} In *McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, the Ohio Supreme Court clarified *Williams* and expounded on what is necessary to establish "cohabitation" for purposes of R.C. 2919.25(F)(2). Essentially, it determined that where there is evidence that two people are living together, "the state ha[s] no obligation to demonstrate the sharing of familial or financial responsibilities and consortium to prove

14.

cohabitation[.]" *McGlothan* at ¶ 15.  It also emphasized that *Williams* set forth nonexhaustive factors.  It noted that shared living expenses "is merely one factor that a court may consider in a cohabitation analysis."  *Id.* at ¶ 7.

{¶ 38} Crisp maintains that the testimony did not show that he and J.H. lived together.  He claims, therefore, that the state was required to provide evidence of the sharing of familial or financial responsibilities and consortium.  While he concedes that he and J.H. had a sexual relationship—the consortium element—he denies that they shared familial or financial responsibilities.  He emphasizes his own testimony indicating that (1) he spent more nights at his own house in Lima rather than with J.H.; (2) he did not contribute financially to the running of the household; (3) he was not on the lease and did not have a key; (4) he had no job, paid no utilities, and did not contribute to groceries for the household; (5) he had no responsibilities with respect to caring for K.B., such as helping with homework or rides to activities; and (6) children's services closed the case against him because he was not a member of the household and a temporary order forbade him from staying at the house in Bryan.  Crisp also points to the absence of testimony from K.B. indicating that he had moved in or was staying there permanently, and emphasizes that even the LEADS search of his driver's license showed that his address was in Lima.  As such, he argues, the state's evidence is constitutionally deficient to convict him of domestic violence.

15.

{¶ 39} In *State v. Tilman*, 6th Dist. Lucas No. L-21-1238, 2022-Ohio-3928, ¶ 5, we considered whether the evidence was sufficient to establish the defendant as a household member. There, the state presented evidence that the defendant received a letter from Lucas County Children's Services and credit card bills at the victim's apartment; the victim testified that she, the defendant, and her daughter regularly shared meals and time together, spent time together with each other's relatives, had an intimate relationship, and shared a bed. She also testified that although his name was not on them, the defendant sometimes helped with household bills, he kept a bag of toiletries at the apartment, and he had garbage bags of clothes in her bedroom, but did not keep them in her closet because it was too full for him to put them away. We found that while conflicting evidence was presented as to whether appellant lived in the home, the evidence was sufficient to establish the defendant as a household member.

{¶ 40} Here, there was evidence presented that Crisp lived with J.H. and K.B. The state presented testimony from K.B. that Crisp would stay with her and her mother "for a long time," would leave to go to appointments in Lima, but would come back. She said that Crisp would stay at their home for about "a month" at a time and received mail at their house a couple of times. K.B. testified that when J.H. told Crisp to leave, he "went into the closet door" "to get all of his stuff," which included "his clothes." And K.B. told Crisp that despite his threats, he wasn't going to leave "cause he didn't have anywhere to go." *See State v. White*, 2d Dist. Montgomery No. 25792, 2014-Ohio-1446, ¶ 14

(concluding that a reasonable jury could find that victim and defendant were cohabitating where, contrary to defendant's testimony, victim testified that she had been living with defendant in his room in a boarding house for about two months when incident occurred).

{¶ 41} But even setting aside this testimony indicating that Crisp lived with J.H. on the date of the offense—which would obviate the need for the state to prove consortium and shared familial or financial responsibilities, *see Tilman* at ¶ 23 ("[T]he element of cohabitation need not be proven where evidence is presented that the parties lived together on the date of the offense.")—there was evidence from which a rational trier of fact could conclude that Crisp and J.H. "cohabitated" as that term has been defined by the Ohio Supreme Court. Crisp conceded the "consortium" element of cohabitation, thus the only issue was whether Crisp and J.H. shared familial or financial responsibilities. Importantly, the state is not required to establish all the *Williams* factors in order to demonstrate that the defendant shared familial or financial responsibilities. *State v. Young,* 2d Dist. Montgomery No. 16985, 1998 WL 801498, *3 (Nov. 20, 1998). And consistent with *Williams*, the focus must be on the *relationship* of the parties and not the fact that they happen to share one address.

{¶ 42} By Crisp's admission, he and J.H. were involved in a romantic relationship. Crisp regularly stayed at the home J.H. shared with her daughter. K.B. described that Crisp would cook at the house, including on the night of the incident, and that earlier in the night, Crisp and her mother did dishes together in the kitchen. She explained that

17.

they would cook together, go out to eat together, and watch movies together. If Crisp left for appointments in Lima, he would come back. In fact, Crisp hurt his foot "running around" with K.B. Finally, K.B. testified that Crisp did not pay bills because he did not have a job; J.H. helped him out.

{¶ 43} Focusing on the parties' relationship rather than their exact living circumstances, these facts, if believed, could lead a rational fact-finder to conclude that Crisp and J.H. shared familial or financial responsibilities. This, plus Crisp's concession of the consortium element, leads us to conclude that the state presented sufficient evidence to establish "cohabitation" for purposes of R.C. 2919.25(F)(2), and that Crisp knowingly caused or attempted to cause physical harm to the child of a person with whom he was cohabiting. Accordingly, we find Crisp's first assignment of error not well-taken.

### B. Consecutive Sentences

{¶ 44} In his second assignment of error, Crisp argues that the trial court's imposition of consecutive sentences is not supported by the record. Although he concedes that the trial court made the findings required to impose consecutive sentences, he claims that the record does not support its findings.

{¶ 45} We review a challenge to a felony sentence under R.C. 2953.08(G)(2). R.C. 2953.08(G)(2) provides that an appellate court may increase, reduce, or otherwise

18.

modify a sentence or may vacate the sentence and remand the matter to the sentencing court for resentencing if it clearly and convincingly finds either of the following:

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

> (b) That the sentence is otherwise contrary to law.

{¶ 46} Crisp's challenge falls under R.C. 2953.08(G)(2)(a) because he argues that the trial court's findings for imposing consecutive sentences under R.C. 2929.14(C)(4) are not supported by the record. We review a trial court's findings related to consecutive sentences de novo. *State v. Gwynne*, Slip Opinion No. 2022-Ohio-4607, ¶ 27.[1]

{¶ 47} Under R.C. 2929.14(C)(4), where a trial court imposes multiple prison terms for convictions of multiple offenses, it may require the offender to serve the prison terms consecutively if it finds that "consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and if it also finds any of the following:

---

[1] We note that a motion for reconsideration of this decision is pending before the Ohio Supreme Court.

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 48} This statute requires the trial court to make three statutory findings before imposing consecutive sentences. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 252; *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 26. It must find that (1) consecutive sentences are necessary to protect the public or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger that the offender poses to the public; and (3) R.C. 2929.14(C)(4)(a), (b), or (c) is applicable. *Beasley* at ¶ 252. A sentencing court must make its findings under R.C. 2929.14(C)(4) at the sentencing

hearing and incorporate them into the sentencing entry, but it need not state the reasons behind its findings. *Bonnell* at syllabus.

{¶ 49} The Ohio Supreme Court explained in *Gwynne,* Slip Opinion No. 2022-Ohio-4607, the review an appellate court must undertake in considering the propriety of the imposition of consecutive sentences under R.C. 2953.08(G)(2). First, it must ensure that the trial court made each of the findings required by R.C. 2929.14(C)(4). *Id.* at ¶ 25. Next, it must determine if the trial court's findings are clearly and convincingly supported by the record. *Id.* at ¶ 26. Reviewing the record for clear and convincing evidence requires the appellate court to (1) determine if there is some evidentiary support in the record for the trial court's consecutive sentence findings, and (2) ensure that whatever evidentiary basis exists is "adequate to fully support the trial court's consecutive-sentence findings." *Id.* at ¶ 29. We may not vacate or modify an order imposing consecutive sentences unless we have "a firm conviction or belief" that the evidence in the record does not support the trial court's findings. *Id.* at ¶ 26-27.

{¶ 50} Here, Crisp concedes that the trial court made the required findings and determined that R.C. 2929.14(C)(4)(c) applies. He contends, however, that the record does not clearly and convincingly support the trial court's findings. While he does not dispute that he has a lengthy criminal history, he argues that he does not pose a danger "to the larger public," consecutive sentences are disproportionate to the seriousness of his conduct and to the danger that he poses to the public, and the harm caused to K.B. was

21.

not so great or unusual that no single prison term adequately reflects the seriousness of his conduct. As support, he maintains that K.B. testified that she was slapped with an open hand, and the pictures demonstrate that there was no bruising—just a slight redness underneath one eye on her cheekbone.

{¶ 51} The state responds that Crisp showed no remorse and did not take responsibility for the offenses; he has an extremely lengthy criminal history and has spent at least 18 years of his life in prison; he violated bond conditions by failing to appear and by violating a no-contact order; he was on community control when he committed the offenses; and he has a history of assaultive behaviors for which he has never been rehabilitated. The state urges that Crisp downplays the effects of his conduct. It emphasizes that Crisp's conduct prevented K.B. from feeling safe in her home, thus she has suffered both physically and emotionally, and Crisp's conduct and criminal history demonstrate that he poses a danger to others with whom he may have relationships with in the future.

{¶ 52} Without question, Crisp has a long history of criminal conduct. The trial court tallied the charges against Crisp at 90—these included probation violations, misdemeanors, and felonies. It noted that Crisp, 46 years old, has spent 18 years of his life in prison and additional time in jail. At sentencing, the trial court took particular interest in Crisp's history of assaultive behaviors. The PSI reveals that he has numerous charges and convictions for assault and poses a particular risk to people with whom he is

22.

in relationships. While Crisp contends that he does not pose a danger "to the larger public," we decline to find that a person does not pose a danger to the public merely because the most frequent victims of his assaultive behaviors are those with whom he maintains relationships. *See State v. Dixon*, 10th Dist. Franklin No. 17AP-884, 2018-Ohio-3759, ¶ 12 (imposing consecutive sentences, recognizing that defendant "demonstrated a clear pattern of repeated behavior in that he has been assaultive to the mothers of his children"). We also decline to find that Crisp's failure to cause serious bodily harm to K.B. requires a finding that consecutive sentences are disproportionate to the seriousness of his conduct. As pointed out by the state, K.B. is a child who was made to feel unsafe in her home, a place where she should feel most safe. The record reflects that the night Crisp assaulted K.B. was a tumultuous night, during which Crisp also threatened (and took steps) to burn down the house. This emotional harm to K.B., along with the physical harm, contributed to the seriousness of Crisp's conduct.

{¶ 53} Accordingly, we conclude that the record clearly and convincingly supports the trial court's findings in support of consecutive sentences, including that (1) consecutive sentences are necessary to protect the public or to punish Crisp; (2) consecutive sentences are not disproportionate to the seriousness of Crisp's conduct and to the danger that he poses to the public; and (3) Crisp's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime. We find Crisp's second assignment of error not well-taken.

23.

## III.  Conclusion

**{¶ 54}** We conclude that after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Crisp and J.H. cohabitated, therefore, his conviction of domestic violence was supported by sufficient evidence.  We find Crisp's first assignment of error not well-taken.

**{¶ 55}** We also conclude that the trial court's findings in support of consecutive sentences are clearly and convincingly supported by the record.  We find Crisp's second assignment of error not well-taken.

**{¶ 56}** We affirm the November 9, 2022 judgments of the Williams County Court of Common Pleas.  Crisp is ordered to pay the costs of this appeal under App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.         

Gene A. Zmuda, J.         

Charles E. Sulek, J.         
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.