[Cite as *State v. Kimble*, 2025-Ohio-310.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio          Court of Appeals No. E-23-054

     Appellee          Trial Court No. 2021 CR 0051

v.

Jonathan Kimble          **<u>DECISION AND JUDGMENT</u>**

     Appellant          Decided: January 31, 2025

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney,
and Kristin R. Palmer, Assistant Prosecuting Attorney,
for appellee.

Karin L. Coble, for appellant.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} Appellant, Jonathan Kimble, appeals the November 7, 2023 judgment of the Erie County Court of Common Pleas finding him guilty of domestic violence, assault, aggravated assault, and felonious assault with a repeat violent offender specification, and sentencing him to an aggregate prison term of 20 years and 6 months up to 24 years and 6 months. For the reasons that follow, we affirm the judgment of the trial court.

## II. Facts and Procedural History

{¶ 2} On February 11, 2021, appellant was indicted by a grand jury in the Erie County Court of Common Pleas in case number 2021-CR-0051 on two counts of felonious assault in violation of R.C. 2903.11(A)(2) and 2903.11(D)(1)(a), a second-degree felony (counts 1 and 4); one count of domestic violence in violation of R.C. 2919.25(A) and 2919.25(D)(3), a fourth-degree felony (count 2); and one count of assault in violation of R.C. 2903.13(A) and 2903.13(C), a first-degree misdemeanor (count 3).[1] On April 13, 2022, in a supplemental indictment, appellant was indicted for one count of felonious assault in violation of R.C. 2903.11(A)(2) and 2903.11(D)(1)(a), a second-degree felony (count 5) and one count of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(D)(1)(a), a second-degree felony (count 6). Counts 5 and 6 also contained a repeat violent offender specification under R.C. 2941.149(A). Counts 1 and 4 of the indictment were subsequently dismissed on October 20, 2023 following the state's motion to amend the indictment.

{¶ 3} The charges in this case were the result of two incidents that occurred on November 18 and 19, 2020 in Erie County, Ohio. On November 18, 2020, at a bar in Sandusky, Ohio, appellant struck D.W., whom the state alleged was appellant's live-in girlfriend, and subsequently fought with J.M., D.W.'s cousin. On November 19, 2020,

---

[1] Appellant was also charged in case No. 2021-CR-0319 in Erie County Common Pleas Court with having weapons while under disability, and that case was tried along with case No. 2021-CR-0051. Appellant has not filed a notice of appeal in case No. 2021-CR-0319.

2.

appellant struck victim K.M., who was D.W.'s friend, at K.M.'s residence in Sandusky, Ohio.

{¶ 4} A bench trial was held on the charges on October 24, 25, and 26, 2023. Before trial, appellant filed a notice of his intention to assert self-defense in response to the charge involving J.M. The state, in response, argued that appellant could not meet his burden of production under *State v. Messenger*, 2022-Ohio-4562, because video evidence established that appellant initiated the altercation by attacking D.W. Before trial, the trial court did not issue any orders relating to appellant's intention to assert self-defense.

{¶ 5} At trial, the state presented the testimony of several police officers who responded to the incidents or were involved in the investigation in conjunction with surveillance videos, videos recorded by police body-worn cameras, and recordings of the 911 calls made by D.W. None of the three victims testified. Following the state's presentation of evidence at trial, appellant moved for acquittal pursuant to Crim.R. 29, which the trial court denied. Appellant then testified on his own behalf, and following his testimony, appellant renewed his Crim.R. 29 motion, which the trial court denied.

{¶ 6} The evidence presented at trial is as follows:

### *The Bar Surveillance Videos*

{¶ 7} On November 18, 2022, D.W., her cousin J.M., and two other individuals were having lunch at a table at Kaman's Korner, a restaurant and bar on Milan Road in Sandusky, Ohio. The state presented two surveillance videos taken by two different

3.

cameras in the bar. In conjunction with the videos, Detective Eric Constante of the Sandusky Police Department testified.

{¶ 8} The beginning of the first video shows appellant entering the bar through its front entrance and approaching the table where D.W. was seated. Appellant had a short conversation with D.W. and the other individuals at the table, during which he paced around the table, and then appellant and D.W. went out a side door. A few seconds later, D.W. came back into the bar with appellant following. D.W. immediately returned to her seat at the table, and appellant walked toward the bar's front entrance before returning to the table, where he began talking to D.W. again. Neither D.W.'s face nor appellant's face is fully visible in this portion of either video. However, it is clear that appellant then struck D.W. in her face. She recoiled and bent over in her seat, covering her face.

{¶ 9} J.M., who was seated next to D.W., immediately stood up and began taking off his jacket while talking to appellant. As J.M. took off his jacket, appellant clenched his fist, took a few steps toward J.M., and then stepped back and put his hands in his pockets. Appellant then took a fighting stance as J.M. began to attack him. Appellant backed away from J.M. as J.M started to swing at him. Appellant and J.M. both fell to the ground, with J.M. on top, striking at appellant. Appellant stood up and ran behind the bar with J.M. following and hitting appellant as appellant ran. Appellant grabbed a liquor bottle from the bar's shelf and hit J.M. over the head with the bottle, breaking the bottle and spraying liquor around the surrounding area. J.M. charged at appellant once more and then backed off. Appellant remained in the bar for a short time, talking to D.W. and

4.

J.M., who were across the room.  Appellant then left from a different side door.  D.W. is then seen making a phone call while bar patrons tended to a heavily bleeding wound on J.M.'s head.

### D.W.'s 911 Call on November 18, 2020

{¶ 10} D.W. called 911, and a recording of the call was admitted at trial.  She told the operator that someone hit her cousin with a bottle, and she said that he was bleeding a lot and felt like he was going to pass out.  She denied knowing who hit her cousin.  During the call, D.W. is heard saying to J.M., "You was getting him the whole time until he grabbed that bottle."  When the 911 operator asked D.W. what started the fight, D.W. said, "He punched me in my face first."  In the background, J.M. is heard saying, "I was trying to protect my cousin."

### Officer Ronta Hill-Morton's Body Cam Video and Testimony

{¶ 11} Officer Ronta Hill-Morton of the Sandusky Police Department was one of the police officers who responded to the 911 call at Kaman's Korner.  During his investigation, Officer Hill-Morton wore a body-worn camera ("body cam") that was recording video.  Appellant objected to the video's admission as violating the rule against hearsay, and the trial court overruled his objection, holding that the excited utterance exception applied.  In the body cam video, D.W. is recorded explaining to Officer Hill-Morton the reason why appellant struck her that day.  D.W. told Officer Hill-Morton, "He's mad I changed the locks."  She further explained, "He took his girlfriend to Miami this weekend so I changed my locks," and "he told me I need to let him in the house."

5.

### *D.W.'s 911 Calls on November 19, 2020*

{¶ 12} The next day, on November 19, 2020, D.W. called 911 twice, and recordings of both calls were admitted at trial. In the first call, D.W. identified herself as the same person who had called from Kaman's Korner the day before. She told the operator that her friend, K.M., had called her using FaceTime and that appellant was at K.M.'s house hitting her.

{¶ 13} In the second call, made shortly after the first call, D.W. told the operator that appellant was following her mother in his vehicle. D.W. said that appellant was driving a rental car, a red Jeep, and she was not sure if he had a gun. D.W. asked if the police had checked on K.M., and the operator assured D.W. that officers were on their way. The 911 operator asked if D.W. knew where appellant lived, and D.W. responded, "He was staying with me and I changed my locks. This is why he's acting like this. This is why he did everything he did yesterday."

### *Lieutenant Danny Lewis's Body Cam Video and Testimony*

{¶ 14} Lieutenant Danny Lewis of the Sandusky Police Department testified that he responded to D.W.'s 911 calls, and he went to K.M.'s residence and spoke with K.M. shortly after the calls were made. Lieutenant Lewis was wearing a body cam, which recorded his conversation with K.M., and the video was admitted at trial, again over appellant's hearsay objection. K.M. told Lieutenant Lewis that she and D.W. were friends, and D.W. was appellant's girlfriend. K.M. said that things started getting "rocky" between appellant and D.W. two to three months before, and around that time,

6.

D.W. brought something to K.M.'s home to store. K.M. denied knowing what the item was. K.M. further told Lieutenant Lewis that D.W. retrieved the item from K.M.'s house the day before, and appellant had shown up that morning looking for the item. K.M. said that when she told him she did not have it, appellant struck her in the eye. K.M. said that she was seeing black after she was punched, and Lieutenant Lewis took a photo of K.M.'s face. In the photo, which was admitted at trial, K.M.'s left eye is bruised and swollen.

{¶ 15} Lieutenant Lewis asked K.M. where appellant lived, and K.M. said she thought he lived in Lima. However, K.M. also said, "[D.W.] caught [appellant] cheating… She changed the locks and said she's going to be selling his shoes."

{¶ 16} K.M. told Lieutenant Lewis that she did not want to pursue charges against appellant. She clarified that D.W. had called the police, not her, and appellant had given her $100 and told her not to call the police.

{¶ 17} During Lieutenant Lewis's conversation with K.M., other police officers located appellant driving a red Jeep SUV and stopped his vehicle. After appellant was arrested, Lieutenant Lewis searched the vehicle, which was a rental vehicle. Lieutenant Lewis testified that he observed that the back seat and trunk area were filled with lots of clothes, bags, and shoes.

### K.M.'s Medical Records and Photograph

{¶ 18} On November 20, 2020, the day after her encounter with appellant, K.M. went to an emergency room to seek medical treatment for her injury. Her medical

7.

records from that day, which were admitted at trial, indicate that she was experiencing headache, nausea, dizziness, and left-sided facial pain, and she had vomited twice. Following a CT scan, K.W. was diagnosed a contusion of the face, head injury, and a closed fracture of left orbital. She was prescribed an opioid pain reliever, an antibiotic, and nausea medication for her injuries. She was instructed to contact a plastic surgeon for further treatment. In a photograph taken of her on November 20, 2020, which was admitted at trial, K.W. had a large, dark black eye. On November 25, 2020, K.M. was examined by another doctor, and following the exam, K.M. was not prescribed any medications.

### *Appellant's Testimony*

{¶ 19} Following the presentation of the state's case, appellant moved for a dismissal pursuant to Crim.R. 29, which the trial court denied. Appellant, who asserted self-defense in response to the felonious assault charge involving J.M., then testified as follows.

{¶ 20} Appellant testified that his relationship with D.W. had only ever been platonic, and he had never had so much as a toothbrush at D.W.'s house. He denied ever having a key to D.W.'s house. Instead, appellant asserted that he was residing in Lima, Ohio, where he was on parole, with his live-in girlfriend.

{¶ 21} Appellant explained that he was in Sandusky on November 18 and 19, 2020 to visit family and to pick up some game consoles he purchased, and he stayed at the Holiday Inn while he was there. He denied attempting to get into D.W.'s house.

8.

Instead, he said he went to Kaman's Korner on November 18, 2020 because he wanted to confront D.W. about the game consoles. Appellant claimed that he had sent D.W. money through a "third-party transaction" for the game consoles, but she never gave them to him.

{¶ 22} When he arrived at Kaman's Korner, appellant asked D.W. to speak on the patio to avoid making a scene. When they got to the patio, he asked D.W. about the consoles, and she "stormed off." Appellant followed her back into the bar, and then approached D.W. again, but D.W. spit on him. Appellant said that was when he "smacked" D.W.

{¶ 23} Appellant testified that he had planned to "leave and chalk it up as a loss," but J.M. approached him. As appellant watched J.M. taking his jacket and watch off, appellant observed a "steel item" that could possibly be a knife. Appellant also knew, through social media and J.M.'s reputation in the community, that J.M. was a mixed martial arts fighter. Accordingly, appellant claimed he tried to retreat, but J.M. jumped on his back. In a further attempt to get away from J.M., whom appellant testified "by far got the better of [appellant]" in the fight, appellant grabbed "the first thing I seen … to get him off of me."

{¶ 24} Appellant heard through a friend that D.W. had taken the game consoles to K.M.'s home, so he went to K.M.'s house to get them. He said that "some words were exchanged between us," K.M. called D.W. on FaceTime, and he left her house. Appellant testified, "[K.M.] was being a little argumentative and fussy, but outside of

9.

that, I said, you know, you broke and y'all could keep the game consoles and I gave her a hundred dollars." Appellant denied hitting K.M.

{¶ 25} Finally, appellant explained that his rental vehicle was full of clothes because he had been on vacation in Miami and he had just gotten off the plane. He said that the items in his vehicle were the things he had taken with him on vacation.

{¶ 26} On cross-examination, appellant admitted that he heard that the police went to D.W.'s house because someone had gotten into her house, but he did not agree that would be consistent with him having so many clothes in his vehicle when the police stopped him on November 19, 2020.

### *Proceedings Following Appellant's Presentation of Evidence*

{¶ 27} Appellant called no further witnesses in his defense. He renewed his motion for acquittal pursuant to Crim.R. 29, and the trial court denied his motion. In a discussion of the instructions, appellant requested that the court consider the lesser-included offense of aggravated assault for count 5, the felonious assault charge relating to J.M. In addition, appellant requested an instruction for the lesser-included charge of misdemeanor assault with respect to count 6, the felonious assault charge relating to K.M. The state objected, and the court requested the parties brief the issue.

{¶ 28} Appellant's brief only concerned his request for the lesser-included offense of aggravated assault for count 5. Appellant argued that the evidence supported an instruction for aggravated assault, claiming that his altercation with J.M. was "no ordinary fist fight" because J.M. was a mixed martial arts fighter. Appellant alleged that

10.

because he knew of J.M.'s fighting skill, he "did not seek or start a fight" with J.M. Instead, appellant contended that J.M. started the fight, appellant tried to get away, and appellant only used the bottle after J.M. was "winning the fight."

{¶ 29} In its response brief, the state asserted that an instruction for aggravated assault requires some evidence that appellant acted under a sudden fit of passage or rage, and appellant had solely pointed to J.M.'s history as a mixed martial arts fighter without explaining why that would have incited a sudden fit of passion or rage. In addition, the state, citing *State v. Wimpey*, 2019-Ohio-4823 (6th Dist.), contended that an instruction for aggravated assault could not be given with a self-defense instruction because the required mental states for the two were incompatible. The court took the parties' arguments under consideration and did not issue a ruling at that time.

### *Verdict and RVO Hearing*

{¶ 30} The trial court issued its verdict on November 2, 2023. Before issuing its verdict, the trial court explained some of its reasoning. The court pointed to appellant's jail calls to D.W. in which he attempted to persuade D.W. to not press charges as consciousness of guilt. The court also found the appellant's testimony not credible on several points, including appellant's own admissions of being untruthful during his cross-examination, the lack of evidence to support appellant's claim that D.W. spit on him, the lack of evidence to support appellant's allegation that he saw J.M. with a knife, the amount of clothes that appellant had in his car despite his claim that he lived in Lima, appellant's claim to have left an expensive game console at D.W.'s home but not a

11.

toothbrush, appellant's testimony that he told K.M. to keep the game console and gave her $100 when he claimed to have exerted significant effort to pick up that same console by driving to Sandusky and confronting D.W., his denial of having a key to D.W.'s home when D.W. told the police that appellant was upset because she changed the locks, and appellant's claim to have stayed at the Holiday Inn when he had no evidence to substantiate that claim and he was driving around with so many clothes.

{¶ 31} Further, with respect to count 5, felonious assault involving J.M., the court noted that appellant filed a notice of self-defense, and the state contended that self-defense did not apply. The court then discussed appellant's request for an instruction on the lesser-included offense as follows:

> The State responded with a case, *State v. Wimpey*, … 2019-Ohio-4823. Aggravated assault instruction and self-defense instruction are incompatible with each other. An instruction on aggravated assault – the Court went to that case and read it. Instruction on aggravated assault is appropriate when the evidence supports a conviction on felonious assault, but the assault results from serious provocation by the victim.

The trial court then found appellant guilty of aggravated assault on count 5 and did not further discuss self-defense. In addition, the trial court found appellant guilty of felonious assault as to count 6, which involved K.M., and guilty of domestic violence and assault as to counts 2 and 3, which involved D.W.

### III. Assignments of Error

{¶ 32} On appeal, appellant asserts the following assignments of error:

1. The conviction for felonious assault as to J.M. is against the manifest weight of the evidence because the trial court failed to properly analyze appellant's self-defense claim.

12.

2. The State presented insufficient evidence as to whether D.W. and appellant cohabited, and so the conviction for domestic violence was also unsupported by sufficient evidence.

3. The State failed to prove that appellant caused serious physical harm to K.M., and so the conviction for felonious assault with the attached Repeat Violent Offender Specification is unsupported by sufficient evidence and violates Due Process.

## IV. Law and Analysis

{¶ 33} Appellant challenges his convictions on all three counts for different reasons. We address each argument in turn.

### A. Self-Defense and Aggravated Assault

{¶ 34} Appellant argues that his conviction on count 5 for aggravated assault as to J.M. was against the weight of the evidence because he contends the trial court should have found he acted in self-defense. Appellant asserts that he set forth sufficient evidence to be entitled to the self-defense instruction, and the state failed to disprove that he acted in self-defense beyond a reasonable doubt. Appellant, after conceding that self-defense and aggravated assault are generally incompatible, concludes that "[t]he greater weight of the evidence weighs in favor of a finding of self-defense, not provocation." Appellant's argument boils down to a contention that as between self-defense and the lesser-included offense of aggravated assault—both of which appellant asserted in the trial court—the trial court chose wrong.

{¶ 35} It is generally accepted that self-defense and aggravated assault are incompatible. *State v. Wimpey*, 2019-Ohio-4823, ¶ 18 (6th Dist.), citing *State v. Cronin*, 2010-Ohio-4717, ¶ 53 (6th Dist.). To convict a defendant for aggravated assault, a trier

13.

of fact must determine that the defendant acted "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation." R.C. 2903.12(A). "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or arouse the defendant into using deadly force." *Wimpey* at ¶ 15, quoting *State v. Coleman*, 2005-Ohio-318, ¶ 25 (6th Dist.). In contrast, to find a defendant acted in self-defense, a trier of fact must determine that the defendant "'had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force." *State v. Wilson*, 2024-Ohio-776, ¶ 20 (discussing the application of self-defense to a felonious assault charge). Although the two are generally incompatible, "'where the record contains evidence from which a reasonable juror could find provocation and reject self-defense, the court must give the provocation instruction.'" *Wimpey* at ¶ 18, quoting *State v. Brown*, 2015-Ohio-3395, ¶ 20, fn. 2, quoting *State v. Smith*, 2006-Ohio-3720, ¶ 59 (1st Dist.).

{¶ 36} Here, appellant requested that the trial court consider self-defense and the lesser-included offense of aggravated assault. As the trier of fact, the trial court was free to reject one in favor of the other. *Wimpey* at ¶ 18-19. Further, because a trial court is presumed to know and apply the law, "we presume that the trial court properly considered the appropriate inferior and lesser-included offenses and defenses." *State v. Dear*, 2014-Ohio-5104, ¶ 11 (10th Dist.).

**{¶ 37}** Moreover, appellant's argument that the trial court should not have found provocation and instead found self-defense ignores that appellant invited the court to make a finding of provocation by requesting the court consider aggravated assault. Under the invited error doctrine, "a party is not permitted to take advantage of an error that he himself invited or induced the court to make." *Davis v. Wolfe*, 92 Ohio St.3d 549, 552 (2001). For example, if a defendant requested a change in jury instructions and the trial court made those changes, the defendant cannot then challenge his conviction on the basis that the changes in the jury instructions were in error. *State v. Olsen*, 2023-Ohio-2254, ¶ 39 (11th Dist.); *State v. Jeffries*, 2009-Ohio-2440, ¶ 71 (11th Dist.) (holding that under the invited error doctrine, appellant could not challenge conviction for lesser-included offense when appellant requested an instruction for the lesser-included offense). We cannot consider whether the manifest weight of the evidence supported self-defense where appellant invited the trial court, as trier of fact, to consider a lesser-included offense that appellant concedes is incompatible with self-defense. Accordingly, appellant's first assignment of error is found not well-taken.

### B. Sufficiency of the Evidence

**{¶ 38}** In his remaining two assignments of error, appellant challenges the sufficiency of the evidence with respect to his two other convictions, domestic violence in violation of R.C. 2929.25(A) as to D.W. and felonious assault in violation of R.C. 2903.11(A)(1) as to K.M.

**{¶ 39}** "Sufficiency of evidence is a term of art for applying the legal standard to determine whether the evidence is legally sufficient to support the verdict as a matter of law." *Toledo v. Manning*, 2019-Ohio-3405, ¶ 13 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The test for sufficiency is one of adequacy, or "whether the evidence, if believed, can sustain the verdict as a matter of law." *Manning* at ¶ 12, citing *State v. Myers*, 2018-Ohio-1903, ¶ 132. Indeed, in making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212 (1978).

### 1. Sufficiency of the Evidence as to Domestic Violence

**{¶ 40}** In his second assignment of error, appellant contends that the evidence was insufficient to sustain an essential element of domestic violence under R.C. 2919.25(A), that D.W. was appellant's family or household member.

**{¶ 41}** R.C. 2919.25(A) provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." A family or household member includes "a person living as a spouse." R.C. 2919.25(F)(1)(a)(i). A person living as a spouse includes anyone who "has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2). The elements of cohabitation are "(1) sharing of familial or financial responsibilities and (2) consortium." *State v. Williams*, 79 Ohio St.3d 459 (1997), paragraph two of the syllabus. Factors that may support a sharing of familial or financial responsibilities include "provisions for shelter, food, clothing, utilities, and/or commingled assets." *Id*. at 465.

16.

Factors to consider as to consortium include "mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, [or] conjugal relations." *Id*. Notably, "[t]hese factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact." *Id*.

{¶ 42} Further, "Ohio courts recognize that '[t]he burden of establishing cohabitation is not substantial.'" *State v. Crisp*, 2023-Ohio-3537, ¶ 32 (6th Dist.), quoting *State v. Woullard*, 2004-Ohio-3395, ¶ 73 (2d Dist.). Indeed, in *State v. Williams*, 79 Ohio St.3d 459 (1997), the Ohio Supreme Court discussed the special nature of domestic violence, explaining that "the offense of domestic violence arises out of the relationship itself, not the fact that the parties happen to share one address." *Id*. at 463.

{¶ 43} Here, appellant argues that the evidence cited by the trial court in rendering its verdict is insufficient to support the verdict. He points out that D.W. did not testify and appellant denied ever having a romantic relationship with D.W. or living with her. He further claims that in rendering its verdict, the trial court cited evidence insufficient to establish cohabitation, such as the amount of clothes that appellant had in his vehicle, that appellant had a key to D.W.'s house, and that appellant had an expensive game console at D.W.'s house. Appellant also challenges the admission of D.W.'s statement on Officer Hill-Morton's body cam video that she changed the locks as being inadmissible hearsay to which he objected at trial.

{¶ 44} As a preliminary matter, "Crim.R. 23(C) only requires the court in a bench trial to make a general finding regarding its verdict," and a trial court is not required to

explain its reasoning. *State v. Travis*, 2022-Ohio-1233, ¶ 20 (8th Dist.), citing *Cleveland Hts. v. Watson*, 2005-Ohio-3595, ¶ 15 (8th Dist.). In addition, a trial court need not make specific findings as to each element of an offense. *State v. Dear*, 2014-Ohio-5104, ¶ 12 (10th Dist.), citing *State v. Ham*, 2009-Ohio-3822, ¶ 37 (3d Dist.); *State v. Lantz*, 2002-Ohio-3838, ¶ 31 (5th Dist.). Accordingly, the trial court was not required to provide a comprehensive list of the evidence it considered in reaching its verdict or make a specific finding at all as to whether D.W. and appellant cohabitated.

{¶ 45} Further, the state set forth sufficient evidence that, if believed by the trial court as trier of fact, could establish that D.W. and appellant cohabitated and that appellant's actions arose out of their relationship. During her second 911 call on November 19, D.W. told the 911 operator, "He was staying with me and I changed my locks. This is why he's acting like this. This is why he did everything he did yesterday." The admission of the 911 call was not challenged at trial, and appellant does not challenge its admissibility on appeal.

{¶ 46} In addition, D.W. made a similar statement attributing appellant's actions to her changing the locks when she spoke to Officer Hill-Morton at Kaman's Corner shortly after appellant struck her and fought with J.M., and those statements were captured on Officer Hill-Morton's body cam video, which was admitted at trial. Although appellant objected to the admission of the body cam video containing D.W.'s statements at trial and on appeal contests their admissibility as hearsay, a police body cam video containing a victim's statements made shortly after a crime occurred, while

18.

still under the stress of excitement of the incident, is admissible under the excited utterance exception to the rule against hearsay. *State v. Stevenson*, 2023-Ohio-4853, ¶ 79 (6th Dist.); Evid.R. 803(2). Here, appellant's statements to Officer Hill-Morton were made shortly after she had been hit in the face and less than five minutes after her cousin, J.M., had been taken away in an ambulance while heavily bleeding. While she talked to Officer Hill-Morton, D.W. was crying and taking deep breaths, her left eye was swollen, and she told the officer that she was seeing spots due to her injury. The trial court correctly ruled that these statements fell under the excited-utterance exception to the rule against hearsay.

{¶ 47} Further, on Lieutenant Lewis's body cam video, K.M. stated that D.W. had been appellant's girlfriend, and their relationship had been rocky for the previous few months. K.M. further stated that D.W. was upset that appellant had taken another girlfriend to Miami, and D.W. had changed the locks and planned to sell appellant's shoes in retaliation. These statements indicate that appellant and D.W. had a romantic relationship and D.W. had possession of appellant's shoes. And immediately after Lieutenant Lewis interviewed K.M., appellant was found driving in a rental car full of clothing and shoes. Further, according to appellant's own explanation for his actions, D.W. had possession of appellant's expensive game consoles.

{¶ 48} Accordingly, the state presented evidence that, if believed by the trier of fact, could establish that appellant and D.W. had, in the recent past, a romantic relationship, thus satisfying the first element of cohabitation, consortium. Next, the state

19.

presented evidence that appellant had been "staying" with D.W. at her house, D.W. had possession of at least some of appellant's clothing and shoes, appellant had expensive game consoles at D.W.'s house, and appellant was surprised and upset that his key to the house no longer worked, all evidence that could support a finding of a sharing of familial or financial responsibilities, including shelter, clothing, and other assets. Although some of the state's evidence may have been circumstantial and not direct evidence of cohabitation, circumstantial evidence may be considered in a sufficiency challenge. *State v. Roberts*, 2023-Ohio-142, ¶ 39 (6th Dist.).

{¶ 49} Although appellant cites other cases in which the state presented evidence of cohabitation using factors not present in this case, such as receiving mail at the same address or helping with household bills, "the state is not required to establish all the *Williams* factors in order to demonstrate that the defendant shared familial or financial responsibilities." *Crisp*, 2023-Ohio-3537, at ¶ 41. Indeed, the cohabitation factors are "unique to each case" and the trier of fact must determine how much weight to give each factor. *Williams*, 79 Ohio St.3d at 465. In this case, focusing on the parties' relationship, the state presented sufficient evidence for a trier of fact to determine that D.W. and appellant had a romantic relationship, appellant lived with D.W. as part of that relationship, and D.W.'s act in changing the locks and thus denying D.W. access to his possessions within their previously shared residence spurred D.W.'s actions in this case.

{¶ 50} Appellant's second assignment of error is found not well-taken.

**2. Sufficiency of the Evidence as to Felonious Assault**

20.

**{¶ 51}** In his third assignment of error, appellant contends that the state failed to produce sufficient evidence to sustain his conviction for felonious assault in violation of R.C. 2903.11(A)(1) as to K.M. because the state failed to produce evidence that K.M. suffered serious physical harm.

**{¶ 52}** For a defendant to be convicted of felonious assault under R.C. 2903.11(A)(1), the state must prove beyond a reasonable doubt that the defendant knowingly caused serious physical harm to another or another's unborn. "Serious physical harm" includes physical harm involving "some temporary, substantial incapacity;" "some temporary, serious disfigurement," or "acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(c), (d), (e). "Physical harm" is "any injury, illness, or other physiological impairment ...." R.C. 2901.01(A)(3). "As a general rule, when injuries are serious enough for a victim to seek medical treatment, a jury can reasonably infer that 'the force exerted on the victim caused serious physical harm…'" *State v. Chambers*, 2024-Ohio-3341, ¶ 181 (6th Dist.), quoting *State v. Dean*, 2018-Ohio-1740, ¶ 47 (6th Dist.), quoting *State v. Lee*, 2008-Ohio-253, ¶ 30 (6th Dist.). Further, "[w]here the assault causes a bone fracture, the element of serious physical harm is met." *Lee*, 2008-Ohio-253, at ¶ 30 (holding that state established serious physical harm where victim suffered nasal fracture). Evidence that the victim had a black eye days after the incident can also establish a temporary, serious disfigurement. *State v. Hill*, 2023-Ohio-2109, ¶ 17 (5th Dist.).

21.

{¶ 53} Here, appellant does not contest that he hit K.W. Instead, he argues that the state failed to present sufficient evidence to establish that he caused K.W. serious physical harm when he hit her. On Lieutenant Lewis's body cam video, which was recorded shortly after her injuries, K.W. said that she was "seeing black" due to the blow. The day after the incident, K.W. went to an emergency room seeking medical treatment for her injuries, and her medical records from that visit reflect that she was experiencing headache, nausea, dizziness, and left-sided facial pain, and she had vomited twice. K.W. underwent a CT scan, after which she was diagnosed with a fracture of her orbital bone. She was prescribed medication, including an opioid pain reliever, an antibiotic, and nausea medication, for her injuries. In a photograph taken of her two days later, K.W. had a large, dark black eye. K.W. later sought follow-up treatment with an eye doctor.

{¶ 54} Accordingly, the state presented evidence that K.W. temporarily lost her vision, suffered a bone fracture, sought medical treatment twice for her injuries, underwent medical testing, was prescribed opioid pain medication and anti-nausea medication, and suffered from a temporary disfigurement. This evidence was sufficient evidence of serious physical harm.

{¶ 55} Appellant's third assignment of error is found not well-taken.

22.

## V. Conclusion

**{¶ 56}** Appellant's assignments of error are overruled. We affirm the judgment of the Erie County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.