[Cite as *State v. Brown*, 2025-Ohio-5603.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Toledo          Court of Appeals No. L-25-00025

     Appellee          Trial Court No. CRB 24 8235

v.

Michael Brown, Jr.          **DECISION AND JUDGMENT**

     Appellant          Decided: December 16, 2025

* * * * *

Rebecca Facey, City of Toledo Prosecuting Attorney, and
Jimmie Jones, Assistant Prosecuting Attorney, for appellee.

Laurel Kendall, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal by appellant, Michael Brown, from the February 4, 2025 judgment of Toledo Municipal Court. For the reasons that follow, we affirm the trial court's judgment.

{¶ 2} Brown sets forth two assignments of error:

I. [Brown's] conviction was not supported by the manifest weight of the evidence.

II. [Brown's] conviction was not supported by sufficient evidence.

**Background**

{¶ 3} The following facts are not in dispute. On June 4 or 5, 2024, Brown met D. when she went to Brown's house on Erie Street in Toledo, Ohio, to have the oil in her vehicle changed. D. moved in with Brown that same day and they started a relationship. At the time, D. was unemployed and Brown was on probation for a domestic violence ("DV") conviction involving another woman.

{¶ 4} On the afternoon of September 7, 2024, and into the early morning hours of September 8, 2024, Brown and D. were at home, along with Brown's five-year old daughter. Brown and D. had been drinking alcohol when a physical altercation occurred ("the incident"), which resulted in visible injuries to Brown and D. Police arrived and arrested Brown and D. and charged them with DV and assault.

{¶ 5} Relevant to Brown, on September 9, 2024, he was arraigned in Toledo Municipal Court on charges of DV and simple assault. A bench trial was held on January 7, 2025, and Brown was convicted of both charges. The trial court found the offenses merged for sentencing; Brown was sentenced on the DV charge to 180 days of incarceration, with 174 days suspended and credit for six days served, he was placed on active probation for two years, his current probation was continued, and he was ordered to continue with the Batterer's Intervention Program. Regarding the assault charge,

2.

Brown was sentenced to pay fees and costs only, which were suspended.[1]  Brown appealed.

{¶ 6} In addition to the foregoing undisputed facts, there are facts in dispute.  The different versions of those disputed events follow, in the order in which the witnesses testified at trial.

**D.'s Testimony**

{¶ 7} D. testified when she and Brown got together in June 2024, he told her that he had "trumped-up" DV charges by his ex, J.T., but he claimed he never hit J.T.  D. then learned Brown was on probation and had an alcohol monitor, but "he started putting baloney in it so he could drink."

{¶ 8} Brown "seemed like he was having somewhat of a bad day" on September 7, 2024.  He went out and came home with alcohol.  Brown wanted D. to drink with him so she had three or four beers that afternoon, but she stopped drinking because Brown started getting belligerent and wanted to get more alcohol.  By belligerent, D. said "he was in front of the mirror with beer in his hand yelling at himself . . . talking to himself in the mirror.  He was arguing with [her], kept calling [her] foul names . . . telling [her she] was a whore throughout the day, that [she] was a bitch and a c***."

{¶ 9} At about 1:00 a.m. on September 8, 2024, Brown was "severely intoxicated" and had music blaring.  His daughter, who had been asleep upstairs, woke up and came

---

[1] Under the doctrine of merger, a defendant who has been found guilty of allied offenses may only be sentenced on one of the offenses.  *State v. Damron*, 2011-Ohio-2268, ¶ 17.  Although Brown was sentenced on both offenses, he did not raise this as error on appeal.

3.

downstairs.  With his daughter on his lap, Brown screamed that D. was a whore and needed to perform a sex act on him.  D. got up from her chair to get her phone charger at which point Brown grabbed her by the throat and put her up against the wall while screaming in her face.

{¶ 10} D. got away, ran upstairs, barricaded herself in the bedroom and put a knife in the door.  Brown kicked the door in and came at her with a knife, although he did not assault her with the knife.  D. was sitting on the bed when Brown, who was on his phone, smacked her and took her phone out of her hand.  Brown tackled D. and wrestled her down on the bed, straddled her, pinned her to the bed, and started choking and strangling her.  D. could not breathe and started to lose consciousness so she started kicking to get Brown off of her and she may have kicked him in the crotch.  He finally let her go.

{¶ 11} D. got up, but Brown started attacking her again.  He got her on the bed, and she tried to fight him off.  She "managed to rip the screen out of the window . . . [and] tried to climb out of the second story window to get away from him because he wouldn't stop hitting [her].  [She] was screaming for help.  He started slamming the window down on top of [her] . . . [She] couldn't breathe because [she] was . . . out the window and he . . . reached out and he put his arm around [her] throat.  And he kept trying to pull [her] back in the window."  He got off of her and walked away so she left the room, grabbed Brown's phone and called 911; dispatch told her the police were already at the house.

{¶ 12} D. went downstairs to find her inhaler, as she has severe COPD and emphysema.  The police were there and sat her down, checked her over and said she had

4.

bruises and marks on her back and neck. The police took pictures of the injuries. D. said she had a black eye, scratches and bruising around her neck, her hand was bruised, and she had "fingerprint bruising . . . bruising around the fingerprints. . . [which were] all Michael Brown's fingerprints from the night of the attack, assault . . . [on her arms and back] from Michael grabbing [her] and throwing [her] around." D. was arrested because, as the police officer explained to her, "in the State of Ohio all it takes is an accusation."

{¶ 13} D. was transported to the police station, and when she arrived, she was pulled out of the police car and asked what was on the floorboard. D. was wearing old glasses and could not see. She was told it was a crack pipe and she "lost it" because it did not belong to her, but she was informed that she was being charged with possession of the pipe.

{¶ 14} D. was unaware that Brown had crack in his house, but she witnessed him do cocaine and "he had got [her] to do some with him back over the summer." D. never smoked crack or meth.

{¶ 15} As a result of the incident, D. "had really severe PTSD episodes" and was in counseling due to really bad night terrors and vivid flashbacks of what occurred.

**Officer Estephan Perez's Testimony**

{¶ 16} Officer Perez testified he was employed by Toledo Police and was working on the day of the incident. He recalled that he "happened upon [the incident]" when he "witnessed a group of young females on the side of the street in the 2200 block of North Erie. They were yelling that someone was screaming for help coming from a house located on the other side of the street." The officer stopped and investigated. He went up

5.

to the house where he heard screaming coming from inside, which was a male voice repeatedly saying you kicked me in the nuts.

{¶ 17} The officer knocked at the door and Brown opened it. Brown exhibited signs of being under the influence and was upset. The officer also encountered a female (D.) in the home as well as a child. D. was very upset, she showed signs of injury and being under the influence. Perez documented the injuries by making a report and taking photos of the scene. In the photos, D. appeared to have swelling on her face and scratch marks around her neck, which the officer acknowledged were consistent with strangulation, while Brown had a scratch with fresh blood on his upper arm. Brown also claimed there was blood in his urine, although the officer did not see any signs of visible injuries from Brown being kicked.

{¶ 18} D. and Brown each said the other person physically struck them, and because Perez was unable to determine who the primary physical aggressor was due to their claimed injuries, D. and Brown were both arrested.

{¶ 19} While Perez was at Brown's house, he recalled there was a crack pipe on the table. The pipe was not taken into evidence since it could not be determined to whom it belonged, so it was not needed.

{¶ 20} With respect to finding the crack pipe in the cruiser used to transport D., the officer was asked if it was possible that that paraphernalia was in the vehicle when D. got in, and he responded "[a]nything's possible, but it's very unlikely that that was there."

6.

**Michael Brown's Testimony**

{¶ 21} Brown testified he never saw D. smoke meth or crack, but he did see drug paraphernalia, like pipes, in her possession. He also saw ecstasy in D.'s possession, and he told her he did not like it around.

{¶ 22} On September 7, 2024, Brown put his daughter to bed and D. left to go get drinks. She came back and they were drinking when D. started to make joking comments about going to get ecstasy. He told her not to, but could not stand in her way, so if she wanted to go, "go do what you want to do. She's like, don't worry, everything's going to be fine." She texted her drug dealer, left the house and was gone for a couple of hours.

{¶ 23} When D. came home, she was acting differently; she was laughing at things you would not ordinarily laugh at and was being loud and obnoxious. She stumbled up the stairs into the bathroom and shouted for him to turn up the radio even though his daughter was upstairs asleep. On the way down the stairs, D.'s words were mixed up and Brown told her to quiet down, and maybe she should just go back to wherever she came; she said she was staying. Brown asked her if she was doing meth again, as she had previously admitted to doing meth with her ex, "and that made her mad. That's what flared her up."

{¶ 24} Brown heard his daughter call out from upstairs. He kept telling D. to leave but she refused. When Brown took his daughter upstairs[2] to put her back in bed, she asked what was wrong and he said D. was not okay, D. was on drugs.

_____

[2] It is unclear from Brown's testimony when his daughter came downstairs.

7.

{¶ 25} D. stormed up the stairs, yelling and screaming. Brown ran into the bedroom, trying to grab his keys off of the nightstand, but D. "grabbed the keys from [him]. And the action of that caught [him] off balance and sent [him] over the nightstand into the wall. Boom, [he] hit [his] head. She falls down on top of [him] trying to get the keys." He was "trying to ball up while she's trying to get [the] keys because she doesn't want [him] to go or whatnot. And she finally snatches [the] keys from [him] and but [sic] she's laying on him . . . That's when [he] used [his] leg strength to get her off."

{¶ 26} Brown started to head out of the door when D. "went out the window screaming help, whatever." He went to the window to try to get her in, but she kicked him. He went into the other room and called his daughter's mother to come and pick up the child. He went back into the bedroom and told D. if she did not leave, he would call the cops. D. said she had nowhere to go. He was "getting mad because she's not -- [he] can't go nowhere and now she's not letting me go -- or, you know what I mean, she's not going nowhere." He told D. to go back to your meth head's house "[a]nd that's when she got mad and she started trying to hit [him]." He tried to block her from hitting him "and that's when she took the cheap shot and she cracked [him] in [his] privates. [He] fell to the floor, [his] phone dropped, and that's when she picked up [his] phone and went in the other room and called the cops." Brown was down on the floor, in the fetal position, then he "went to the bathroom shortly before the officers arrived and [he] was peeing blood."

{¶ 27} On cross-examination, Brown testified that while he was on the phone with his daughter's mother, D. "was actually doing most of her swinging at [him] after [he]

8.

told her to go back to her meth head's house." He said this occurred after D. went out of the window screaming for help.

{¶ 28} Brown's visible injuries from the incident were to his head and scratches on his arm and back.

{¶ 29} Brown admitted his five-year old daughter was home at the time of the incident and heard everything and saw the physical altercation between him and D.

{¶ 30} On redirect examination, Brown acknowledged paraphernalia was found in his home, but it was a "[d]ab apparatus . . . it was marijuana . . . that was there cuz . . . she smokes weed all the time . . . she smokes every day." Brown did not believe that the police found any weed in the home after the incident.

{¶ 31} Brown was asked about work and he said he had worked in the middle of the summer, "but it was kind of hard with [his] alcohol classes." His classes ended and he graduated the Thursday before the incident. The classes were "[i]nitially . . . from a CSB case."

{¶ 32} On recross examination, Brown agreed that there was another referral to CSB after the incident, for not only the physical altercation but because the house was filthy.

**Alexandria Barnes**

{¶ 33} Barnes testified she is the mother of Brown's five-year old daughter. Barnes was aware of the relationship between Brown and D. and had witnessed them drinking beer.

{¶ 34} To Barnes' knowledge, there were no narcotics in Brown's house.

9.

**{¶ 35}** On the day of the incident, Barnes received a call from her daughter at 3:30 a.m. wanting to be picked up at Brown's house. Barnes went to Brown's house and when she arrived, the police were there, and Brown was at the door with their daughter. Brown appeared to be shaken up.

**Law**

**DV**

**{¶ 36}** R.C. 2919.25 provides in pertinent part:

(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.
. . .

(D)(1) Whoever violates this section is guilty of domestic violence, and the court shall sentence the offender as provided in divisions (D)(2) to (6) of this section.
. . .

(3) . . . [I]f the offender previously has pleaded guilty to or been convicted of domestic violence . . . a violation of division (A) . . . of this section is a felony of the fourth degree . . .

**Standards of Review**

**{¶ 37}** When reviewing the sufficiency of evidence, a court of appeals must consider "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Brinkley*, 2005-Ohio-1507, ¶ 40, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, fn. 4 (1997). "The test for sufficiency is one of adequacy, or 'whether the evidence,

10.

if believed, can sustain the verdict as a matter of law.'" *State v. Kimble*, 2025-Ohio-310, ¶ 39 (6th Dist.), quoting *Toledo v. Manning*, 2019-Ohio-3405, ¶ 12, citing *State v. Myers*, 2018-Ohio-1903, ¶ 132.

{¶ 38} By contrast, when determining whether a conviction is against the manifest weight of the evidence, an appellate court must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 2010-Ohio-6048, ¶ 48 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When an appellate court reverses a trial court's judgment on the basis that the verdict was against the weight of the evidence, the appellate court "sits as a '"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs* [*v. Florida*], 457 U.S. [31,] . . . 42 [(1982)] . . ." *Thompkins* at 387. "Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the fact-finder's credibility determinations, given that it is the finder of fact that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Brooks*, 2023-Ohio-2978, ¶ 13 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). A reversal on manifest weight grounds only occurs in the exceptional case where the evidence weighs heavily against conviction. *Thompkins* at 387.

11.

## First Assignment of Error

{¶ 39} Brown argues the trial court lost its way and created a manifest miscarriage of justice because the evidence does not prove an intent to harm D. beyond a reasonable doubt. He asserts it is undisputed that there was an altercation, although the cause of the altercation was disputed and the descriptions of the altercation were convoluted but he testified that his actions during the altercation were essentially self-defense. He contends the evidence shows a mutual, spontaneous domestic argument, without injury to either party serious enough to warrant medical attention. He submits that the explanation of the injuries does not align, such that the evidence does not show intentionality. He also observes that the police testified that both parties appeared intoxicated.

{¶ 40} Brown further argues that D. called 911, but she was arrested at the scene and charged with DV as well as possession of a crack pipe, even though she denied any knowledge of the pipe. He contends there was no resolution on the record as to D.'s alleged possession of the pipe, or of his allegation that she consumed ecstasy that day.

## Second Assignment of Error

{¶ 41} Brown argues that the State did not actually prove that he knowingly caused or attempted to cause physical harm to D. While he does not deny that D. was injured as a result of the incident, the evidence adduced at trial did not prove beyond a reasonable doubt that he intended or deliberately planned to physically harm her. He contends the facts of the altercation were disputed, but both versions involve allegations of the parties wrestling each other, hitting each other, and pushing each other off, by hands or legs or both. He maintains there was also evidence that D. ripped a screen off a

12.

window and attempted to jump out so he restrained her from jumping out the window, arguably preventing her from further, potentially irreparable harm.

{¶ 42} Brown notes that "Black's Law Dictionary (7 pocket ed) defines 'knowing' as '[h]aving or showing awareness' or 'deliberate; conscious.'" He submits that a DV conviction requires proof beyond a reasonable doubt that the offender intentionally or deliberately harmed the victim, not simply that the victim was harmed. Brown asserts "there was no evidence of any planning of this altercation, or of any intent to injure the other." Rather, he insists the evidence suggests that what occurred was a free-for-all, with both parties intoxicated, angry and behaving like undisciplined children.

## Law and Analysis

{¶ 43} We will examine Brown's assignments of error together.

{¶ 44} Brown was convicted of DV, the elements of which are to knowingly cause or attempt to cause physical harm to a household member. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Based on this definition of "knowingly," the State was not required to prove specific intent to cause physical harm in order to support a conviction for DV. *State v. Dyer*, 2023-Ohio-544, ¶ 12 (2d Dist.). "'Knowingly' does not require the defendant to have a specific intent to cause a certain result; rather, that is the definition of 'purposely.'" *State v. Stover*, 2017-Ohio-291, ¶ 14 (8th Dist.). *See* R.C. 2901.22(A).

{¶ 45} Upon review, it is undisputed that at the time of the incident, Brown and D. lived together in Brown's house, thus D. was a member of the household. Next, contrary

13.

to Brown's argument that a conviction for DV requires proof beyond a reasonable doubt that the offender intentionally or deliberately harmed the victim, not simply that the victim was harmed, intent is not an element of the crime of DV. On that basis, we find that Brown's argument that his conviction was not supported by sufficient evidence because he did not intend to injure D. lacks merit. Moreover, viewing the evidence in the record in a light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt that Brown knowingly caused or attempted to cause physical harm to D., by grabbing her throat, tackling her, wrestling with her, pinning her to the bed, choking her, strangling her and slamming the window down on her, as these actions would probably cause physical harm to D. We therefore find sufficient evidence to support Brown's conviction.

{¶ 46} With respect to Brown's manifest weight of the evidence challenge, we have reviewed the entire record, weighed all of the evidence and reasonable inferences, and considered witness credibility. At trial, Brown and D. presented differing accounts of what occurred before and during the incident, and the State offered pictures of the injuries sustained by the parties, which included scratches on D.'s neck and arm, bruises on her back and arms and a scratch on Brown's arm. The trial court, as trier of fact, was in the best position to judge the credibility of the witnesses and decide which party to believe.

{¶ 47} It is apparent that the trial court chose to accept D.'s version of events, which was supported by the injuries depicted in the pictures, instead of Brown's account. There is nothing to suggest that the court lost its way or created a manifest miscarriage of justice by concluding D. was more credible than Brown. We therefore find this is not the

14.

exceptional case where the evidence weighs heavily against finding Brown guilty of DV, as such, Brown's conviction was not against the manifest weight of the evidence.

{¶ 48} For the foregoing reasons, we find Brown's conviction to be supported by sufficient evidence and not against the manifest weight of the evidence. Accordingly, Brown's first and second assignments of error are found not well-taken.

{¶ 49} The judgment of the Toledo Municipal Court is affirmed. Pursuant to App.R. 24, Brown is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| Thomas J. Osowik, J. | |
| --- | --- |
| | JUDGE |
| Christine E. Mayle, J. | |
| | JUDGE |
| Myron C. Duhart, J. | |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.